I have two cases on the argument schedule today. First is Morocho versus the Warden of Philadelphia and the Andrade versus the Director of Philadelphia Field Immigration. Appellate numbers 26-1150 and 26-1454. Good morning, your honors. May it please the court. Charles Roberts for the United States. I'd like to reserve four minutes for rebuttal. That'll be granted. Thank you. You're welcome. This case may be resolved on the government's straightforward textual interpretation of B-2A. There's no dispute that petitioners are applicants for admission under B-2A. Instead, the dispute boils down to two other words, seeking admission. Under our view, Congress used seeking admission simply to describe something that all applicants do. It is synonymous. That meeting is confirmed by statutory context, in particular, subparagraph A-3, as well as A-5, along with the statutory history of 1225. If we can focus on the text for a moment of 1225, your argument is essentially applicant for admission and one seeking admission are synonymous terms. And if that's the case, why didn't Congress just say such applicant instead of saying seeking admission? By using seeking admission, it connotes that it was, Congress was aiming at something different. Please tell me why that's an incorrect interpretation. Yeah, I don't think that we have the kind of language here that we would expect when Congress is trying to connote something different. Rather, Congress could use any number of formulations, the one your honor just offered, in order to define something or describe something synonymous. It doesn't need to be such as, it doesn't need to be set off as a, it doesn't need to be using those particular words your honor described for it to be the same meaning as an applicant for admission. If we were expecting Congress to set off seeking admission as a distinct condition, then we would expect there to be that sort of if language that there is with respect to clearly and beyond a doubt eligible for admission. That's the only independent condition that we see in B-2A. Seeking admission is not set off in that way. And this is something that the Eighth Circuit- Does your argument turn on the viability of the admission fiction? That is that someone who has been here but has not gone through inspection is not really quoted, needed, close quote, even if they've been here for 25, 35 years. They're never, they're not really here under that fiction. What do you think is your argument, rise or fall on the validity of that argument? I don't think that our statutory interpretation argument rises or falls on the entry fiction. I do think it supports our argument, but what we have in B-2A is a deeming clause that tells us that anyone present here is deemed an applicant for admission. And where do you see the word present in the statute? A-1, Your Honor, an alien present in the United States who has not been admitted or who arrives in the United States, and then there's a parenthetical, that alien present or who arrives in the United States shall be deemed for the purposes of this chapter an applicant for admission. And so that tells us who an applicant, that tells us some of who an applicant- You said that someone who's been here for 10 years, 15 years. Yes, there's no temporal limit on here in A-1. That is, it's a broad deeming clause. It's for the purposes of the entire chapter, not just 1225. There's no reason, and I don't think there's any dispute actually from petitioners either that they are applicants for admission. Their entire argument- What about the admitted language, the word admitted? 1101A13A talks about someone admitted is someone who is lawfully entered. It's the government's position, and I don't think your adversaries would disagree, that these folks never lawfully entered. So how are they even captured by any of this anyway? They never sought lawful admission. They're not doing anything affirmative to change that status. The only thing that's occurred is they've been apprehended by federal law enforcement. So how is this even applicable to them? I don't take petitioners to dispute that they are applicants for admission. They are deemed such by B-2A. I don't think that there's a dispute there. But the clause continues by saying seeking admission, and there's nothing to suggest they were seeking lawful entry as a result of an inspection and authorization of an immigration officer. That's correct. That's their argument. Their argument is that seeking admission imposes an additional condition on top of being an applicant for admission. And I just don't think that the statutory text there supports that reading. If we were to expect it to be an independent condition, we would expect language like if and, or who is, or who is also seeking admission. And that's not there. Rather- What their argument is though, is that they're not seeking admission. They're already here, which is why I asked you about the entry section at the very beginning. Our argument is that they are deemed applicants for admission. They don't dispute that. And by virtue of that deeming, they are applicants for admission. But the second part is putting the benefit in the hat. You're saying we've got A, and because we have A, then that gives you B. And I'm not sure that's true. Well, actually, is that your argument? Can you just from the ground up, please define for the court what seeking admission means? Because my sense was that it was the other side who was trying to say, make the argument about whether seeking admission or applicant for admission are the same. But just as a statutory interpretation matter, what does it mean to seek admission under B-2? Under B-2, well, so under B-2A, what we have, I don't think that you can take it out of the applicant for admission context. We have someone who is an applicant for admission. But that's basically, and then just so we understand that, that's basically everybody who's here. Is deemed an applicant for admission under A-1, 1225 A-1. I mean, an alien present in the United States who hasn't been admitted. If they haven't been admitted, then they're an applicant for admission. They're deemed that under A-1. That's not every alien in the United States, but that is, yes. Who has not been admitted. Yes. Okay. And so seeking admission, then if you would go ahead and define that, sorry to interrupt you. No worries, I think it's synonymous with applicant for admission. In the case of B-2A, it is just describing something that all applicants do. And in the case of someone who is simply deemed to be an applicant for admission, it is describing the sort of legal fiction that the deeming clause creates. I guess if I can ask the question a different way though, is the only way to define the phrase seeking admission to tautologically say it's like the same as applicant for admission? Do you know what I'm saying? Because I mean, the statute doesn't actually connect the terms quite in that way. So if you were just looking, I mean, why? So in other words, there must be some independent meaning, some objective meaning to the phrase seeking admission that causes the government to conclude it's one in the same with applicant for admission. I think the reason is it is juxtaposed with is alongside applicant for admission. And in B-2A, what it says is an applicant, that's someone who is applying for admission, that's synonymous with someone who is seeking admission. Is admission a term of art defined in the statute? Admission is, yes. And where would you point us for the legal definition? That appears in 1101A13A. And that says the term admission and admitted mean with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer. Well, the reputation that they give to your analogy of being a seeking admission to a college though, would say to me that they are saying that these folks are not seeking admission, they're in fact seeking relief from removal, which is different from seeking admission. I think that's true of, I mean, that would be true of applicants for admission too. Those that are applicants for admission who are not actively applying for admission are nonetheless deemed to be so by the A-1 Deeming Clause. What's the so, you say so, what's the so? They're deemed to be applying for admission, to be seeking admission. We view those as synonymous in the context of B-2A. But this deeming analysis is because you say that's what the two words mean. There's nothing in the statute that deems someone who's an applicant for admission as one who is seeking admission as equivalent. That's just the government's interpretation. Yes, so it's a contextual interpretation of applicants applying and seeking all alongside one another in B-2A where we don't have a separate definition of seeking admission and we don't have it set off as the kind of independent condition that petitioners would need it to be to impose it. It does not just tell us a lot. If seeking admission doesn't have a separate definition by statute, unlike the word admission, we are then to look at plain meaning, commonly understood terms, correct? Well, and that's where my question comes from. Because I would, if I were looking, I mean, just looking at the plain meaning and do as a judge here, having to interpret the statute, I would think seeking admission means, you know, wanting to be in the United States, just plain and simple. So I mean, in other words, might argue it was broader than applicant for admission. Seeking admission, I mean, at any point in time, there's no like set point in time continuum. Seeking admission just means at any point in time wanting to be present in the United States. Or does the government think it's narrower than that? I don't know if it's narrower than that. I don't think it's seeking to be present in the United States, unless we view it as- You don't think it's seeking to be present in the United States? I do think it- Like here on U.S. soil, seeking admission? So I do think that it is synonymous with applicant for admission in the context of B2A. I don't think that it is. So if it is seeking admission, if we take that out of context and read just seeking and just admission, then you do have the technical term of admission. But by virtue of the deeming clause language, we have people who are not applying for admission being deemed applicants for admission. And so we know that it can't just be that pure straight meaning of, as petitioners would put forward. But I mean, doesn't, in some sense though, isn't any alien present in the United States who has not been admitted seeking admission unless they are saying voluntarily they want to leave?  Okay. So I think that that view is also confirmed by the statutory context that I mentioned in my introduction, which is subparagraph A3, the or otherwise language. So admission, sorry. So admission could also be defined as wanting not to be removed or deported. I think in writing context, that is a meaning that can be ascribed to B2A with respect to when read in context with the A1 deeming language. And then also particularly with respect to A3. What way should we give to the government's interpretation of the statute even after the RERA? This goes back, I think, 150 years is how the statute has been interpreted by the government, which would be inconsistent with your interpretation, consistent with the Second Circuit's recent decision. And I realized this, we all realized there's a circuit split here. But I think you mentioned history in context. The history would seem to be a very strong argument against you. I don't think so, Your Honor. There's a couple aspects of history at issue in this case. And I took the thrust of Your Honor's question to be about past executive practice. And I don't think that reaches back 100 or more years. It mostly reaches back 28, 29 years. We're going to RERA. To RERA. And I see my time is up. We're gonna keep going with our questions. Yeah, sure. So with respect to executive practice, there's no principle by which statutory authority, and particularly a statutory mandate, as we read B2A to B, evaporates or disappears through lack of use. And we cite the Pereira versus Sessions case for that in particular, where 21 years of executive practice did not overcome the plain statutory text in that case. Can't the planning category for how we interpret it in terms of the statute, there's obviously got to be strictly legal analysis. But, you know, I couldn't help feeling somewhat like Alice through the looking glass as I thought about your argument, as she spoke to the Cheshire Cat. You're asking us to order you to spend, I don't know how many millions of dollars a day to incarcerate a lot of folks who don't need to be incarcerated. Now, you might take issue with the second part of that, but let's assume there's a whole universe of people out there. And it would seem to me that certainly Mr. Maraccio arguably is amongst them, who are not at risk of flight, not at danger to the community. And you're asking us to spend, to order you to spend the money and find the facilities to lock them up, as opposed to asking us to give you the discretion to lock up folks in appropriate circumstances who may need to be detained. But yes, that's what you're asking. So that, I can't help scratching my head at this. We're asking the court to uphold the plain statutory text as Congress wrote it. And I didn't say it that way, but you can also say it the way I just said it in terms of the result of the act. Well, let's just take it concretely to what actually Congress did. When Congress entered the statute in 1996 and amended it, among the things it did was it recognized that there was an increased mandatory detention for certain criminal aliens. And as a result, it ordered 500 new detention beds and Congress gave a pause to the enforcement of the statute to let those beds become available. That is a congressional conduct from which it seems reasonable to infer that that was an indication. It did not mean for 1225 to be used to mandatorily detain everybody. Because if it did, it would have contemplated what judgment he is alluding to, which is space, facility, funding, et cetera. How do you reconcile that congressional act with the government's current position? Yeah, there only needs to be sort of a plausible interpretation of that distinct congressional action and a possible explanation of why Congress might have chosen two different approaches. One possible explanation that we would offer is that the folks that needed to be detained under 1226C are among the worst of the worst. And you might need different, more substantial, more secure sort of facilities to detain those folks than you would for the folks covered by the- If you think about it, we can assume we're not talking about the worst of the worst. Clearly, Mr. Maraccio and Mr. Andrade were not serial killers. We're not talking about the worst of the worst. We're talking about people who in the same universe, an immigration judge could well hear their case for release on bail and granted very quickly. I take that point, Your Honor. And I was responding to Judge Schwartz's question about why the detention mandate under 1226C might have been deferred by Congress, whereas the one under B2A was not. And so 1226C, that's the folks that we don't think petitioners fall under that category. But those are the sort of folks that we might expect for the reason that I described, Congress would have deferred detention for them for a couple of years in order to create those more secure facilities for the worst of the worst. If I can just ask more questions about the resources here. I mean, I'm obviously sympathetic to the textual reading of the statutes. My colleagues are asking questions about resources. And I think suggesting that maybe it seems like there were a lot of resources being used by the government to detain people in use 1225. But could the government explain the resource intensity if in the alternative, the government were forced to rely on 1226 here? With bond hearings. Like in other words, like if we're saying there's a lot of resources under 1225 being used, what's the story, what's the picture? If this court thinks 1225 is not applicable here and we're under the 1226 scheme. Well, under 1226, you would not have eligibility for parole. And so the folks would, there would not be sort of that release valve for the executive to parole folks into the country if that were necessary under the conditions set forth in 1182. That talks about someone who's at the border. I think our scenario is talking about folks who are here and the bond hearing. And we're talking about bond hearings for those who have been in the United States, not at the border. What about that is beautiful, the language that they're using. Sure, so if we go under 1226, there's a new parole. So that release valve is taken away. There's also bond hearings for all of these individuals. And so that's what's overwhelming many district courts across the country. But the focus here would be on the immigration judges. And we got an amicus brief from a bunch of immigration judges who said they could handle it. It would take a vast amount of resources for the government to process folks through 1226 and subject every one of them to bond hearings. More resources than the cost of locking them up? I don't know, Your Honor. And I don't think that that's necessarily relevant to weighing the straightforward statutory interpretation question here. I said at the beginning, it couldn't control our legal analysis, but it's got me scratching my head. No, and the other point that I wanted to make in response to Your Honor's question about IAIRA's and perhaps, I guess, the history of IAIRA and executive practice is that it's actually petitioner's interpretation that we think would resurrect precisely the sort of perverse results that Congress sought to eliminate in IAIRA. So under their view, aliens who are lawfully presenting themselves at ports of entry are subject to mandatory detention under 1225, but aliens who unlawfully cross our borders, thereby committing the crime of unlawful entry, have adversely possessed the right to a bond hearing. That just doesn't square with what Congress was trying to do in IAIRA, and that's confirmed by the legislative history. But the legislative history, Her Honor, there's a sentence later that says we are simply restating the bond issues. So I'm not sure the legislative history is, first, there's a real question of how much we should lean on it anyway, but I don't know if it necessarily advances the ballpark. For every sentence you find, there's a sentence that supports the contrary position. I don't think that the point about restating necessarily is as strong as petitioners make it to be, but I do take Your Honor's point that legislative history is not as positive here. That's why our argument starts, and I think ends with the text when I hear questions about the history and the purpose of Congress enacting IAIRA in 1225b2a. That's my response. With respect to these particular petitioners, was there some examining officer who made a determination that is contemplated or b2a, and if so, who is that? Yes, and I'm sorry, I don't have the page right in front of me. Is this from the person who signed the notice to appear? It's the notice to appear, Your Honor. Okay, but that's after the fact determination. People are being brought into custody, and then the notice to appear is being made, correct? I don't know if that's the record here, Your Honor. I'm not sure. You can't represent one way or the other as whether or not they knew who they were picking up before they picked them up. The notice to appear, we think, satisfies the 1225b2a. That satisfies the one condition in there of not clearly and beyond a doubt entitled to release into the country. I understand your position. I have one other statutory question. I'm of course gonna let my colleagues see if there's other questions they have. 1225a4 speaks of the ability to withdraw an application for admission. That seems to contemplate an act that occurred separate from being admitted, a chance to withdraw that application. Tell me why that's wrong. So we, I don't think that we can dispute that applying for admission is synonymous with being an applicant for admission. So it's the folks who are, again, deemed to be applicants for admission. They're also deemed to be applying for admission. But with this concept of withdrawal of the application, how would one withdraw their application that they never filed? That is a tricky part of the deeming aspect of this, we're deeming folks to be applicants and to be applying for admission that wouldn't necessarily be so under a contextual literal reading. How does a four, we'll use your analysis. How is one invoke a four if an applicant for admission is the same one as seeking admission? I would assume you would say, well, one withdraws their application by leaving the United States. That's right, voluntary departure. Then why aren't those words used in the statute and simply say you could leave the country? No, it uses very specific language, withdrawal of an application. That's a meaning. I don't think so, Your Honor. I'm asking you to deem folks who aren't literally submitting an application for, I and Congress are asking you to deem folks who haven't literally submitted an application to be applying, to have applied, to be applicants for admission. And for the benefit of the record, that when you use the word deeming clause, you're referring to the definition of A-1. It does not use the word define, but I'm referring to A-1. That's when you use deeming clause, that's the clause you're referring to, correct? Okay, thank you, Judge Nascar. In seeking admission, I mean, just to your, I mean, basically it sounds like your argument is that all applicants for admission are seeking admission, but then to build on some of my colleagues' points, and then even with A-3, seeking admission could be broader because there could be a way to seek admission, presumably other than an applicant for admission, even if you look at A-3, the provision next to the one that my colleague was asking you about, all aliens who are applicants for admission or otherwise seeking admission. So is that the government's position that all applicants for admission are seeking and there are additional ways to seek admission? That's correct. Okay. I was trying to, at an earlier point, I was talking about A-3, that's exactly how we read A-3, and we think that that confirms that subset-superset relationship between seeking and applicants for admission. And so where we don't, and so where in B-2A, we don't have seeking admission set off as an independent condition, we therefore think that it is synonymous with applicant for admission as it is, as it's sort of described as A-3. And so A-3 sets up a useful analogy, I think would be if you were to confront a statute that says all students who are football players or otherwise seeking to play sports, that's what we have in A-3 here. We have all applicants for admission, all aliens who are applicants for admission or otherwise seeking admission. That confirms that Congress thinks that those two things are working together in the same way in 1225. Football analogy again, all applicants who are football. All students who are football players or otherwise seeking to play sports. And so A-3, we have all applicants for admission or otherwise seeking admission. Why wouldn't that be somebody trying to go up to the team as opposed to someone, in this case into the college analogy that they had some issue with. If you're a football player, I'm not sure you can say you're seeking to play sports or already playing sports. This gets me back to the entry fiction that I asked you about at the very beginning. If you're already here, it's one thing. If the entry fiction is valid, it seems to me that points are in a different direction than if the entry fiction is regarded as truly the fiction, as I think Supreme Court said, and I can't pronounce it, Theresa Jam, I think it is. And Sean has seen a whole line of cases that talks about the legal fiction of someone who is here, but did not go through the process of inspection and entry who did never ask here. They are in fact here. And we can say as a matter of law that they're not here because they were never admitted, but nevertheless they are here. So when you say seeking admission to some place you already admitted to, that's what has my mind jumping hoops over this thing. And it seems to make a lot more sense to resolve that quandary under 1226 than it does under 1225. I think that point might've had more force before IARA when Congress did away with entry as the sort of gatekeeping threshold here and enacted admission instead, and so- Yeah, but the entry fiction is not, to the extent that it's valid or was ever valid, it's not really been done away with. Theresa Jam certainly casts some doubt on it. Shronisey does too, but Shronisey is before Errula was enacted. That was 53. Again, I think that the entry fiction has to do with maybe constitutional questions, which we haven't reached with respect to due process more so than it does with how to interpret the plain text of the deeming provision. I agree with that, but I'm not sure you can totally disconnect them because the same thing to get this constitutional issue goes to whether or not someone is being admitted to a place that they're already in, no matter how they got there. That's the trick. And the constitutional issue pops up because the Supreme Court has said it doesn't matter how they got here. Once they're here, they have a certain repository of constitutional rights because the due process clause applies to them, no matter how they got here. But I thought your term of art argument on admission and admitted under 1101.13a, I mean, they can't be admitted because if that's a term of art, you're saying they've been lawfully entered after inspection and authorization, which the government's position is that that hasn't happened here. That's right. And so the entry fiction that earlier I mentioned, I think it actually supports our view is that they're stopped at the threshold and Congress made that clear with respect to 1101 and by incorporation of admission into 1225, all the provisions of 1225 that we've been discussing this morning. So, and I don't know if this argument or question would be dispositive, but to the extent that some of the other opinions written on this or questions here today then are more broadly looking at the phrase seeking admission. I mean, maybe that's where this case in some people's view turns is how seeking relates then to 13a. And so, I mean, and I don't know if you've got that particular like subsection in front of you, but 1101.13a, the terms admission and admitted mean with respect to an alien, the lawful entry of the alien to the United States after inspection and authorization by an immigration officer. So that clearly to your point earlier seems to be describing what's happened once somebody has been lawfully admitted. But I take it to be the government's position that the alien doesn't have to be intentionally seeking every aspect of that at every moment they're here to be considered seeking admission. And in other words, they're trying to stay here and to stay here for it to be lawful, they have to be admitted after inspection. But they're seeking admission in a sense just by wanting to remain present physically here. That's correct. And they're applicants, they're applying, they're seeking simply by virtue of being present. And that's what we learned from A1. Is seeking in your view defined anywhere else in the statutory scheme, or can we construe meaning of seeking from looking to other places? We don't have an explicit definition of the word seeking, but I would go back first to A3, which I mentioned and your honor mentioned in the question as well. That's establishes a strict relationship between applicants for admission and seeking admission. And I would also point to A5, which says that an applicant for admission may be required to state under oath, the purposes and intentions of the applicant in seeking admission. And so we know that there are applicants for admission who are not taking the affirmative steps that petitioners would under their interpretation required. We know that A5 also, again, sort of reconfirms that Congress is presuming them to nonetheless be explicitly in the words of A5, seeking admission. So like A3, we think that that confirms that statutory interpretation as well. Judge McKee had some questions about due process. Yeah, the due process question. I know that only applies to Mr. Andrade, but maybe you can help me out on why your interpretation of the statutes does not create a pretty serious due process argument in terms of Mr. Andrade to be held without the possibility of showing that the detention is not necessary because he's not a threat. I'm not saying he's not, I'm just saying it denies him the opportunity of showing he's not a threat to the community and there's no risk of flight. So why incarcerate the individual? And why doesn't that scenario denying that opportunity, flying the bases at Baez and Shaughnessy, Wickdell going back that far, why doesn't it create a due process problem? We don't think that it creates a due process problem from the moment of detention, as Petitioner Andrade needs to argue. The point is that Congress did not establish those flight risk or dangerousness conditions as the relevant ones for statutory purposes under B2A. Those are not the criteria for detention or for the contingency. So flight risk is not a problem because Congress didn't give him that right? That's right. So our view is, and the Supreme Court's view under Connecticut Department of Public Safety versus Doe is that the statutory process that is due for a procedural due process plan is set up by statute. One's reputation in the structural registration theory and arguably he already had that due process because it was either convicted or not convicted or plead guilty to the offense which triggered the obligation to register as a sex offender. Totally different situation from here. I don't think so, Your Honor. And I think that cases like Munoz- I don't think so. We wouldn't be having this discussion. But why is it analogous? A situation like Doe where the issue was his reputation already had the due process, at least arguably he already had the due process. Here where there has been no procedure at all that arguably would give Andrade the due process that Doe got at his trial or his due to the proceeding. The process, the procedural due process that is here is what is set up by statute. And that's the determination by an immigration officer that he is not clearly and beyond a doubt he's entitled to admission. That's the process that was set out here. And that's the rule of law from Connecticut v. Doe. So you're saying that he could be held in perpetuity and that would be okay. No, I don't think that that's the upshot of our argument. Why couldn't he be held in perpetuity? What's preventing it? I think that that's a different question for a different case. That's the question I'm asking you in this case. Why couldn't he be held in perpetuity? So I don't want to foreclose arguments that we might make down the line. A case that presents much, much longer detention would potentially present different questions about due process. And what would be wrong with that? Sorry? What would be wrong with holding him in perpetuity? You're saying you already had all the processes due. So why couldn't he be held in perpetuity? I think he's had the procedural due process that he's due. And I don't think- So he could be held in perpetuity. I don't know. And I don't think that this court needs to answer that question. Well, you need to answer the question because I'm asking you the question and that's why you're standing there. Now answer the question. Why couldn't he be held in perpetuity if you're right? That's a different case than the ones that we were discussing. Sometimes we ask the hypothetical it's a different case. Sometimes we get first year law students who come in and we let them argue in court situations and they'll say, you've already that's a different case. And I like to remind them of the fact that's what hypothetical is. It's a different case. And we often ask lawyers for different cases to try to figure out where our ruling will get us. Where does your argument logically get us? And that's what I'm wrestling with. Where does your argument logically get us? Now I know where it's gonna get us is a different case by definition but I'm trying to figure out what we end up with if you're right. If there's no due process issue here for Andrada I know he's the only one who raised it. Why couldn't he be held in perpetuity? The very fact you're unconscionable with that question I think answers my question. There's gotta be something wrong with that. And I think what's gotta be wrong with that is found in the fifth amendment and the 14th amendment. It's called the due process clause. I don't think so Your Honor. I think that what Congress provides in terms of the procedure that is all of the procedural process that is due. What the Supreme Court and this court has identified in some other cases of prolonged and perhaps indefinite detention which is not the case here. Prolonged and perhaps indefinite detention is a potential substantive due process problem once you get to that length of period. What is that process these two folks get? I'll focus on process. You alluded to Judge McKee that the process they got was an immigration officer's determination that they are not clearly and beyond a doubt entitled to be admitted. What process did they get? You said there's a notice to appear and there's a signature. What was the process? Simply their status of being present and not being from the United States and not having been admitted? That is the process that Congress is- That's all they're entitled to. That is what- What process did we, what process preceded the issuance of this notice to appear? Was there a proceeding where the individual appeared? There was not- In the records, what did we do? There was not a proceeding at which Mr. Andrade appeared. The notice to appear was issued in an ordinary course and that is what Congress has set forth as the procedure that is due under B-2A. Do you have a question? Okay, Counselor Agambo, thank you. Good morning, Your Honor. Michael Tan, may it please the court. I'm here on behalf of Petitioner Eppeleve. I want to start right away with the text of 1225 B-2 and explain why it doesn't apply to petitioners. Dan, you have a very soft voice. You just try to- Oh, I'm sorry, Your Honor. I can hear you, but it's not easy. I'll speak up.            Thank you. So to take a step back, the statute says, in the case of an alien who's an applicant for admission, if the examining officer determines that an alien seeking admission is not entitled to be admitted, the alien shall be detained. So Congress's use of the phrase, in the case of an applicant for admission, followed by an alien seeking admission, makes clear that the focus is on those applicants for admission who are seeking admission. Now, the government makes two mistakes. First, it gives the terms their ordinary meaning, citing how a college applicant is seeking admission to college. And second, as Judge Hortz pointed out, it makes the reference to seeking admission superfluous by arguing that applicants for admission are necessarily seeking admission. But this is, of course, the Immigration Act, where we have terms of art with technical meaning, and we have two distinct conditions for detention in this statute. So to start with applicants for admission, Congress deemed aliens applicants for admission simply when they're present here without having been admitted at 1225A1. This is what the 11th Circuit calls a passive condition. The Supreme Court has- Your clients fall in that category. Yes, our clients have been deemed applicants for admission. And the Supreme Court has explained that to deem is to treat something as if it were really something else. So Congress deemed people applicants for admission, even though they're not applying for or seeking anything. What case are you relying on? You said the Supreme Court- That's Sturgeon against Frost, Your Honor, at 587 U.S. 28 from 2019. Congress then included a second condition for detention, saying you also have to be seeking admission. So what's seeking admission? Seeking is given its ordinary meaning of looking for or trying to gain. It's a present participle, so it describes an ongoing action. And as Your Honors were discussing, admission is defined by statute to refer to a lawful or authorized entry into the country from outside the country upon inspection. So seeking admission describes someone who's seeking to enter upon an inspection by an immigration officer at the border. It doesn't describe petitioners. Petitioners were deemed applicants for admission as a passive condition based on their presence in the country, but they weren't seeking admission at the time of their arrest and detention, having already entered and lived in the country for many years. Instead, the statute that governs their detention is 1226. That's in keeping with both the history, as discussed in the law professor's brief, where the act has required the detention people inspected at the border for more than a century. The 1226 seems to have a condition precedent, which is an arrest warrant, right? The very first set of words in that statute is arrest warrant. There's no arrest warrant in this case, as far as we could tell from this record. Yes. And your position is 1225b2 doesn't apply to them because they're not making an act to seek admission. So what's the government to do with someone like that? We have a bunch of folks in the United States that can't get arrest warrants because they don't have an identifier to put on the warrant. What are they supposed to do?  So I appreciate the question, Your Honor, and to clarify, so 1226 does authorize arrest pursuant to a warrant, but it's not a conditioned precedent for detention under 1226. And that's because there's a separate statute, which really hasn't been briefed in this case, but it's at 8 U.S.C. 12, sorry, 1357, K2, which allows for warrantless arrest where the officer has probable cause that the alien is violating the immigration law or a flight risk. So there's actually a separate authority that allows for warrantless arrest that's used all the time for people in the interior. And would that trigger 1226, even though the language speaks of an arrest? It would, Your Honor, and that's how the statutes have been read and implemented since the 1996 act. And that's because 1226 is the detention authority for people arrested in the interior. That's what the Supreme Court said in Jennings when it laid out the structure of the statute. It explained that 1226 is the detention authority for people arrested inside the U.S., whereas 1225 B2 applies to people arrested at the border. If your client had been arrested under 1226, though, there's a jurisdiction stripping provision within 1226, wouldn't that put you guys in a worse position? Because you would have been stuck with whatever the immigration judge says, and according to the language of that statute, there'd be no judicial review of that. Am I wrong? So, as we're referring- That Judge McKee was talking about in terms of, you know, restoration- Yes, Your Honor. Restoration detentions. Yes, Your Honor. So you're referring to 1226 E, which essentially strips federal court review of discretionary bond decisions so that bars review of things like the bond amount that the judge thinks is necessary to ensure the person's appearance and what not. Any discretionary judgment means even the decision to set the bond or not set the bond. Yes, it applies to discretionary decisions, but it doesn't bar review of legal arguments, including arguments like the ones where petitioners are advancing today about what statute applies. The Supreme Court so held in DeMoore against Kim when it said when you're challenging the statutory framework for raising a constitutional challenge, that that provision of 1226 does not bar review. So that would not apply to this case. So you're saying it's similar to the judicial review provisions that arise generally under ERARA, where issues of the law can be challenged, but discretionary review can't. Same with, or maybe it's the same provision as in subsection E. Those are not reviewable. Right, so I believe you're referring to the provision of 1252, which sort of restores jurisdiction in petitions for review of removal orders, where there's a bar that serves jurisdiction there. We actually don't even need to have recourse to that because the Supreme Court has already construed 1226E, the provision Judge Schwartz was referring to, to not apply to legal and constitutional challenges. And so that does not present a bar to review here. How do you reconcile the position that you seem to be taking, that those who are stopped at the border get detained under 1225, but those who have surreptitiously entered the United States undetected have a chance to ask requests for bonds? That's my biggest argument, too, with your definition. Yeah, how do you reconcile that, particularly with the 1996 Act, looking to harmonize, equalize the treatment of those who were subject to exclusion versus deportation? Sure, so I have a few responses, Your Honor. First, and this is where the parties agree, we think the text is clear, so you don't need to look to purpose. But as to purpose, I have four points. And so we look to result. She's asking about result. And the result, we refer to it as a reverence. It's a good argument. You end up with a kind of a non-separative result, a very unfair result, which would lead to inference that that can't be what Congress intended. Yes, Your Honor, I understand. So we actually disagree that there's some kind of reward or unfair result here, and that's because Congress provided another tool to deal with recent border crossers. It provided expedited removal at 1225b1. And what that provision does is authorize the executive to put people in fast-track deportation proceedings and mandatory detention during that process for people who cross the border and have been here for up to two years. Wait a second, aren't you saying those people are just kicked out faster than the people like your client who's already been here for many years? So he gets more time. But doesn't that still get to the fairness point? The people who are under expedited removal are kicked out even if they have less time here. And they have to be stuck in jail while they're waiting for that time. Whereas in your client's case, you're saying people can be here for 20, 30, 40, 50, 60 years and then still get more time and not be in jail. So it's just more unfairness. I don't think it's unfairness, Your Honor. I think it recognizes the reality that once people have lived here and established deep ties to family and community here in the country, they're differently situated, particularly from a detention perspective. The incentives under that structure, which you're saying Congress set up, is massively in favor of coming into the country undetected. Why would any sane person ever try to lawfully enter at the border under that understanding of the statutory scheme? Because you can come in. You don't ask permission, right? It's always better. Don't ask permission, ask forgiveness. And they're gonna be forgiven. And they can remain free and wait for volunteering. I think the statute reflects, Your Honor, that Congress was weighing both considerations. Yes, they wanted to tighten up on border security and that's why they created expedited removal and applied it to people who have been here for up to two years. But they also recognize that at a certain point in time, if you've been living here and you've established ties to family and community, your status changes. And this is a longstanding idea in immigration law that once people establish, and the government actually fights these cases as well, once you've established ties to your community, your status under the statute and the Constitution change, and so you should be treated differently. And to be clear, all we're talking about here is a bond hearing. We're not saying people can't be detained or they're not subject to removal proceedings. The issue is just whether they're gonna get to go before an immigration judge to determine whether they're a flight risk in danger. And from that perspective, it makes sense that Congress preserved bonds for this population of people because unlike folks who are stopped at the border or recent entrance, where the government rarely knows anything about them, the facts that go to bail risk are readily available for review for long-term residents like petitioners. Your adversary talked about the fact that risk of flight and danger are nowhere in the statute to be considered. Is he right or wrong about that? So the stat, you mean 1226, Your Honor? Or 1225. Or 1225. 1225 obviously is mandatory detention, so it wouldn't be there, although I think there's a provision about humanitarian release or something. Right, so the contemporaneous regulations for 1226 do provide for an inquiry into flight risk and danger, and we would also require that it's constitutionally required. I mean, these are the two touchstones for civil detention. And I'm happy to address the government's points about Connecticut against Doe if that would be helpful in this context, but that's part of the problem with detaining people under 1225 and leaving them with parole is the only avenue for release. The inquiry and parole to get out is whether your release would serve an urgent humanitarian reason or there's an urgent humanitarian for your release or would serve a significant public interest. And in our view, that's the wrong inquiry. Sorry again, I missed that.  Excuse me. What you just said, I missed that. Can you repeat that? Sure, so I think we're kind of shading into the due process area. So maybe I'll just briefly speak to the due process issues. I will say just before I get into them, I think, you know, obviously we're the court to rule for petitioners on statutory grounds. There's no need to get to the constitutional issue, but I will address them here. I think Judge McKee was looking for clarification on your analysis that under 1225- Oh, I'm sorry. That there is a parole avenue for those who are mandatorily detained. And if you want to just explain- I'm sorry, Your Honor. So for people detained under 1225-B-2, the parole statute is the only avenue for release. And the standard for release under that statute isn't flight risk and danger. It's a much more restrictive standard that only allows for release if there's an urgent humanitarian reason to release the person- That would be in capital Z. This is at 1182-D-5. D would be? D, D as in dog, Your Honor. And so the two touchstones for parole are urgent humanitarian reason or significant public benefit, not flight risk and danger. And this is part of why, I mean, a core reason why we think that process is constitutionally insufficient. It's not asking the right question. And so by definition, there's a very high and unacceptable risk of error when it comes to reviewing civil immigration detention. I'd like you to, if you could, unpack a little bit more of your statutory argument since that's what a lot of the other opinions around the country address on B-2. Because I hear you to be essentially saying that there are two elements. You have to be an applicant for admission and seeking admission, which are separate things. And I just, I'm struggling to find that in B-2A. I mean, it says, subject to paragraphs B and C in the case of an alien who is an applicant, if the examining immigration officer determines that an alien seeking admission is, you have to be this and that. In fact, it just seems to most logically be that the determination that an alien seeking admission is referring back to the previous phrase. And the surplusage arguments are sort of suggesting that anytime a statutory scheme just makes multiple references to a particular category, somehow we have a surplusage problem. So if you could just explain that to us a little bit. Sure, so two responses, Your Honor. I think that reading would have more force if the statute said the alien seeking admission in which it would more naturally refer back to applicant for admission as the reference, but it says on alien seeking admission. And we agree, of course, this isn't an if the officer determines phrase, but we still think the reference to an alien seeking admission after the reference to applicant for admission is doing that work. And there are other examples of that throughout the act. So for example, actually in 1225, if you look at A2, it talks about an arriving alien who's a stowaway shall be removed upon inspection. There's no, if the officer determines that the arriving alien is a stowaway, then they should be removed. It just says on alien who's arriving alien is a stowaway, but of course, Congress accepted that the agency would make a determination about whether the person is a stowaway or not. And so we don't see any need for an if, I think Congress could have used an if clause, but the language Congress did in fact use in referencing an alien seeking admission is sufficient to require a determination and make that language a condition for detention here. The other point I would like to make on that front, Your Honor, is that, I'm sorry. Just to pause you there, because I think that you just said that your view is that B2A requires a determination that somebody be seeking admission, but it clearly doesn't mean, when it uses the word determined, the determination is about not clearly beyond a doubt entitled to be admitted. I mean, that's the object of the word determined, isn't it? If they determine that they're not clearly and beyond a doubt entitled to be admitted. So I can't possibly be referring to seeking admission. It's referring clearly to something else. So, respectfully, I disagree, Your Honor. I think the statute is telling us that this detention provision applies to those applicants for admission who are seeking admission. I think that's the only way to make sense of the use of the two clauses here. In the case of an applicant, an alien seeking admission is subject to detention, because otherwise that phrase is doing no work. Well, but I mean, you're using the word detention. I'm simply saying that there's, like the determination being referred to in 2A is not about whether they seek admission. That's right. But our position is that, and seeking admission is still a condition for the statute to apply. That the statute is saying, this statute applies to applicants for admission.  That has no relationship at all to do with whether they're an applicant for admission. No, no, no, no, no, Your Honor. Our position is that some applicants for admission are seeking admission and some aren't. Our clients aren't. And they don't want to stay here. They do want to stay here, Your Honor, but that doesn't constitute seeking admission. What are they seeking? So they're seeking asylum. Illegal entry? They're seeking a- Personal presence? I'm sorry, Your Honor, I didn't mean to speak over you. That's okay, go ahead, please. They're seeking asylum, which is a form of relief from removal from the country. And that's not the same as seeking admission as the Supreme Court made crystal clear in Sanchez against Mayorkas, when it distinguished between admission and lawful status. And so, yes, Your Honor, our clients want to stay in the country. They are seeking lawful status in this country in the form of asylum. But the holding of Sanchez, which actually affirmed the decision of this court by the same name, is that an application for lawful status or gaining lawful status through asylum is not the same as being admitted. And that's because of the statutory definition of admission, which again refers to an authorized entry from outside the country into the country upon inspection by an immigration officer. I think Sanchez against Mayorkas makes that point crystal clear. I hesitate to get us into a totally separate area of the law, but since you mentioned, I mean, they're seeking asylum as of when? Because I thought that the whole asylum, like if you come to the border and you request asylum, isn't it automatically a totally different set of procedures? I mean, have they been seeking asylum since they entered years ago? So there's different ways to seek asylum under the immigration laws, Your Honor. And so I believe what you're referring to is the route for people that are put into exped removal, that fast-track removal process that generally is applied at the border where you've got an interview, you're screened, and only if you pass that interview, you get put into removal proceedings. They're not going through that process. They're just seeking asylum through ordinary- After having been arrested for illegal- Well, in both cases, they had actually previously applied for asylum affirmatively. And so that's part of what's so troubling about the government's detention policy is that they are sweeping up people who have long been known to the government, and both our clients, in fact, had work authorization, and were picked up on their way to work despite no changes in their underlying immigration case or the circumstances of their lives. So it's not like they were kind of hiding in the shadows. They had applied for asylum, were in that process, had been work-authorized, and then were suddenly arrested and detained pursuant to this new policy. Could you respond to the staying with the statutory questions or otherwise argument that the government has made in some of the other cases that discussed turning your attention to 1225A3? What is your response to that argument? Yes. So, Your Honor, this is really the linchpin of the argument and to kind of look at the statute, to take a step back and look at the text. So as you know, the statute requires the inspection of all aliens who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States. So the plain language requires the inspection of all applicants for admission, as well as any other alien who's seeking admission, readmission, or transit. The government hinges this entire argument on the or otherwise saying that makes applicants for admission a subset of seeking admission, which by the way, I think is a little different than saying their synonyms. So I found that a little confusing, but my understanding of the government's argument is that they think applicants for admission are a subset of seeking admission. But the Supreme Court has recognized in cases like health and healthcare against TAVA Pharmaceuticals, that or otherwise doesn't always subsume one term under another. And that's not what it's doing here. In our view, what the or otherwise is doing is just describing an overlap between related terms. It reflects that some applicants for admission are seeking admission, but it doesn't say all of them are. And that's consistent with the statute as a whole. So I can provide a quick example. Think of a lawful permanent resident who returns from a trip abroad. The statute deems them an applicant for admission when they arrive at the airport, at the port of entry. That's under again, 1225A1. That also means they have to be inspected upon return as an applicant for admission under 1225A3. But LPRs aren't seeking admission under the statute because they're entitled to travel freely in and out of the United States. And so Congress has said LPRs aren't seeking admission unless a special circumstance applies. And that's at 1101A13C. So a returning LPR is deemed an applicant for admission again, when they arrive in the U.S. at a port of entry, subject them to inspection, but they're generally not seeking admission. And so that shows that the government's argument is wrong. It can't be that all applicants for admission are subsumed under seeking admission because some applicants for admission are seeking admission and some aren't. We have an overlap. I'd also refer the court- So you're saying, is there actually- Yes. You're saying that the statutory scheme says LPRs are not seeking admission? Unless a special circumstance applies, yes. Because admission in 13A says lawful entry after inspection. And I believe that you just referred to LPRs facing some kind of inspection. I mean, right? Like, and also asylum, since that's the particular, we don't have an LPR in this case, right? You say you're seeking asylum. So is it your position that asylum is a form of seeking admission? Because you have entry after some kind of inspection or analysis by an immigration officer. So it would seem to fall under 13A. Yeah. So I'll take the last question first, Your Honor. Seeking asylum is not seeking admission. That's because seeking asylum is seeking a form of lawful status that protects you from removal from the country. Whereas admission is defined by statute as a lawful or authorized entry into the country from outside the country after inspection. And that's the upshot of- Not be covering asylum. I mean, as a common sense understanding though, how can that not be covering asylum? Because I thought to get asylum, you were here. Yes. And then you've requested asylum and you have some kind of determination made by an immigration officer. So just under the common meaning of inspection or authorization by an immigration officer, doesn't that have to happen in asylum? So I think this is a very good example of how terms in the immigration context are technical. And I would refer, Your Honor, again to Sanchez against Mayorkas. When you apply for and gain asylum, you gain a lawful status, but you're not admitted. And so if you entered unlawfully, apply for asylum, get it, and are afforded that status, you can stay here under that status, but it doesn't cure the fact that you made an unlawful entry. And that's because an admission is a lawful entry upon inspection by an immigration officer. That's what the Supreme Court held in Sanchez and Mayorkas and what this court actually held in the underlying decision reviewed in that case. Due process, I'm gonna ask you some questions about that. Please. The substantive due process claim, which came up in the brief, assume this court were to consider that argument. What framework are we applying? Are we applying Zedavitis' special justification? Are we using Denmore's other language that talks about necessity or something along those lines? Like what's the framework to determine? We know we have to identify whether there's a fundamental right, and then we have to determine whether or not that fundamental right has been infringed upon. What's our standard? Yes, Your Honor. So we would advance the framework from Zedavitis, which holds that detention must be supported by a special justification as a substantive matter, but also accompanied by adequate procedures to ensure that detention is serving that goal. And here, the purpose of detention as a constitutional matter is to ensure the person is available for removal proceedings or to protect public safety. And with the exception of Denmore, which I can get to in a moment, the Supreme Court has repeatedly recognized that the process required in the civil detention context is a hearing to decide if detention is justified. The court has so held in cases like Salerno, Hendricks, Fuchsia, and in fact, it's even required hearings for lesser interests, like deprivations of property. Think of Goldberg against Kelly. Where are you getting the considerations of danger and flight risk? I think I asked that before, and I'm not quite sure where that's coming from. Sure, so I think- Is that deprivations of liberty, or is it coming somewhere in the statute? Where are you getting that? So it's coming from the due process clause, and I think that's recognized in Zobitis, and this court has also recognized that in its own detention cases. And so your honor is speaking to the government's argument against Connecticut against Doe that due process somehow only guarantees procedures to assess the factors laid out by statute. That's dead wrong. The case law makes crystal clear that due process imposes substantive and procedural requirements on detention that the statute doesn't. So think about this court's decisions in Dioff, Chavez-Alvarez, and Herman Santos, which all address mandatory detention of criminal aliens under 1226C. Those cases recognize that once mandatory detention exceeds a reasonable period, due process requires a bond hearing on flight risk and danger, even though the statute prohibits a hearing on those factors. I'm sorry, do you- Now the government- Criminal context, civil, or both? These are, I'm talking about immigration and detention, so civil immigration detention here. So I suspect the government will say those cases are just about prolonged detention, but they stand for more than that. They make clear that the Fifth Amendment imposes requirements that the statute doesn't. Otherwise, this court wouldn't have ordered bond hearings on flight risk and danger. And you can look at the Supreme Court's cases too. Fuchsia against Louisiana. I'm sorry, your honor. I just wanted to see if my colleague had any- Forgive me, your honor. I would just refer the court to Fuchsia against Louisiana, which is also a very clear example of how due processing requires a substantive determination for detention, as well as adequate procedures, in particular, a hearing. What do you do about the language, instead of Fijian suggesting that if somebody has not been given lawful entry or lawful status, that their process due is the process that Congress provides for? Yes, your honor. So we disagree with the government's reading of Thursigian. The government argues that it makes admission the touchstone for whether due process applies, and we just think that's wrong. That would make no sense under Thursigian, which focused on the fact that the petitioner in that case, who was arrested 25 yards from the border, was still on the threshold of entry, and so hadn't affected an entry for purposes of the due process clause. And this brings me to my other point, and this is another place where the government is dead wrong when it argues the entry fiction applies to petitioners. It's clear petitioners have made an entry. The government is not contesting that. And we have more than 100 years of case law going back to Yamataya, holding that when a non-citizen enters the United States, affects an entry for purposes of the due process clause, due process applies, even if that entry was unlawful. You can look at cases like Zidvaitis, Nizai, Thurassingham, just last year in AARP, and this court in Jop also held that due process applies to a person who's affected on an unlawful entry. So the government is simply wrong that the entry fiction applies in this case. Unless there are further questions. Ms. Naska, anything further? Okay, all right. Thank you, counsel. We urge the court to affirm. Thank you very much. And we'll have the government up on rebuttal, please. Thank you, Your Honor. In rebuttal, I'd like to address a few, I guess, issues that I've- With Sanchez in there, you may be planning on doing it anyhow, could you address the argument he made regarding Sanchez? Sorry, what is this? Could you repeat that? His argument regarding Sanchez. Herman Sanchez. It's the mandatory detention case. Mayorkas, I think it is. Yeah, when our court held that, there becomes a point in time in a mandatory detention scenario where process, the individual's entitled to procedures on a hearing. Right, Sanchez versus Mayorkas. So I think that to be, I don't want to get too far out over my seat. I don't think that that has been addressed directly in our briefs, but that goes back to the point I think I may have raised earlier about substantive due process, which is not what we understand petitioners to have raised here. Forgive me, when I said, when Judge McKee touched Sanchez, this is my fault. I thought he was referring to the Third Circuit case from Herman Sanchez. Judge McKee is actually talking about the case that made a distinction between admission and lawful status. Part of the policy. You may be calling him Mayorkas. 141, Supreme Court, 1809, 2021 case. So with respect to the entry section, I think that the Supreme Court has been repeatedly and adamantly clear that lawful admission is the touchstone with respect to the entry section. It's not just that you set foot in the United States and then you attain all of the full set of due process rights that petitioners advance here. And I think the cases like Sidvaitis and particularly Kaplan, which addressed an individual who was here for nine years and determined that they did not have that same full extent of due process rights. They were stopped for legal purposes. As a legal theory, they were stopped at the border for purposes of due process after nine years of physical presence. But I think we're asking about a different, it's Sanchez versus Mayorkas. Your adversary described it as making a distinction between someone who's been admitted and someone who seeks lawful status. I.e. someone who's obtained asylum doesn't necessarily be one who was lawfully admitted. So you're talking about due process. And I think the question that Judge McKee was asking was something different. This whole entry fiction is bothering me. Maybe it's bothering me more than it should be. But excuse me, it may be bothering me more than it should be, because it may not be that humane, but I can't help but thinking that it's at the very foundation of what we're trying to get at here. I don't know how it necessarily transfers in terms of the statutory text of 1225 and 1226 in terms of the principles driving 1226. And particularly what this inquiry was talking about in Jennings, toward the end of Jennings, it seems to me that that implicates the entry fiction. I may be wrong about that. But that's why I asked about Mayorkas, and I understand Mr. Tan using the case in that way. And I couldn't be wrong if I'm wrong, Mr. Tan. I apologize to you. So I don't know. I don't think that that case addressed 1225 B2A. And I don't think that, I mean, or 1225 B2A in particular, which is what we're dealing with here. So what we need to do is work within the context of B2A, what those terms mean and what Congress deemed them to mean and what Congress's context in neighboring provisions illuminates that they mean. So the entry fiction is not where we should be starting to figure out what the terms of B2A mean. We should be starting with the terms of B2A and then the deeming provision that helps us understand those terms. And then the neighboring statutory context that further helps us understand those terms. I do want to highlight just briefly a couple of the issues with respect to the statutory interpretation. Under petitioner's view, there are at least five objective statutory conflicts or superfluities that we recognize under their reading. And these are all largely briefed, but we understand them to read out of B2A being the case of an alien who is an applicant language. We read them to read out otherwise in, or otherwise in A3. We take their reading to entirely nullify B2C, a provision just after B2A. And we also take them to sort of undo the deeming language's breadth, its reach to all present aliens. Their interpretation would have us carve that back in every instance after Congress has deemed them so broadly. In A1, every other instance under their reading carves that back by using that seeking admission language. So as the Fifth Circuit and Eighth Circuits have both done, we respectfully ask the court to reverse and hold that B2A mandates detention. Sorry, I have another question. What is your response to your colleague's argument that if somebody is seeking asylum, they're not seeking admission? I think that, so if we were out in a universe that without the context of B2A, without the context of the deeming provision, purely working with 1101, that argument may have some force, but we don't have, it does not have force here where we are working within the context, the specific context of B2A. What we have here is them being applicants for admission and therefore applying for admission and therefore seeking. So what clause is it that brings the asylum applicant under the seeking admission status? Is that the deeming provision? Yes. Okay. In 1225A1. Yes, and A1, we understand, we know that a deeming provision brings folks in, and I heard my colleague on the other side to say this, it brings folks in to being applicants for admission who otherwise wouldn't be. And so it's the same inquiry in B2A with respect to seeking admission. It might not be someone who literally, in a technical sense, outside of B2A is seeking admission. So one final question. So A1 would cover asylum applicants. Does it also cover LPRs? In certain circumstances, yes, but in certain circumstances by statute, not by virtue of the independent meaning of seeking admission or any of these other terms, by statute, Congress has chosen to carve out other certain individuals from that meaning of applicant or that meaning of seeking admission. And that just demonstrates our point that for that carve out, they would be in this realm. They would be in this realm of seeking admission. Really, this is from Jenny. They used the Supreme Court reporters that 138, Supreme Court reporter 838. And the court is saying after discussion, this is before the legal analysis. So it clearly is dictum. In sum, US immigration authorizes the government to in turn detain certain aliens seeking admission into the country under sections 1225B1 and B2. It also authorizes the government to detain certain aliens already in the country pending the outcome of removal proceedings under sections 1226A and C. And then they go on to say the primary issue in this case is the proper interpretation of 1225B, 1226A, and 1226C. But it seems to me they've already interpreted for us 1225B1 and B2 and 1226A and C in saying what they apply to it. That doesn't get us to the answer of how do we apply it, but it does say what they apply to. And there, it seems to me the court is clearly saying that in terms of these two individuals who've already achieved getting physically present into the US, I'll avoid the term entry or admission, it's saying that 1226A and C control the proceedings. But why isn't that something that controls our inquiry here, even though it's dicta? Well, so there are a couple aspects to that question. The first is, as your honor recognizes, it's dicta. And so that's generally not controlling, even if it were directly on point. And we have a whole lot of cases, and we're not unique in this, to say that we have to give very serious consideration to the Supreme Court to consider dicta. And I don't know of any case where this court is deviated from dicta handed down by the Supreme Court. Well, so I think that my next point was going to be if the petitioner's reading is adopted, you'll be deviating from other language within Jennings as well. There's something for everyone in Jennings, and there are a couple of other page numbers. And I don't want to belabor it by reading to the court Jennings, but I would commend you to pages 297, 287, and 288, where there are at least three other pages. 297, 287, and 288. And I'm happy to read the beginning of that language or all of that language, but I think one of the strongest versions of it is, read most naturally, 1225B1 and B2, exactly the provision at issue here, thus mandate detention of applicants for admission until certain proceedings have concluded. And so that's their applicants for admission, they've conceded that under Jennings, you would have to be departing from that language in the Supreme Court's opinion in order to rule in their favor. So again, we're sort of in a battle of dicta here. But you should hear it, certain applicants already in this country, which is not necessarily inconsistent with what you just said. I'll have to go back and take a look at that language. I'll do that after. I don't want to worry you by my reading. You don't look like my grandkids. That's- I don't want to read you. But I will take a look at it. No, it's all of our jobs to be reading these decisions and to read them closely, I agree. But if you take what I just read from Jennings, for what it's worth, it says mandate detention of applicants for admission. And again, they don't dispute that they're applicants for admission. They're present in the United States without awful authorization. Yeah, the issue is already in the country. That was the issue. The applicants for admission, but they're already in the country. And that's where the court said 1226A and C apply and not 1225. You'll have to take another look at it. Yeah, I don't take it to read that B2A does not apply. It's sort of in the dicta set up a bit of a dichotomy, but again, it's qualified. It says certain aliens in each of those instances. It doesn't say there's- Okay, it would be helpful if you could give us a 28J letter specifically, primarily because I can't read all my writing, but I want to make sure that book signers have an opportunity. To the extent that Jennings is helpful here, and I think it could potentially be very helpful, if you could just submit a 28J letter and your friends and others, I could do the same in terms of the applicability of Jennings and specifically those pages. I think you mentioned 297, 27, and 288 and how that would apply. Happy to. Okay, thank you. Thank you for your argument, counsel. We'd ask that a transcript of this argument be prepared and not be sidesplit the expense of that. We thank counsel for their fulsome arguments and excellent briefing. And the court will take the matter under advisement.